## Case No. 14,581.

UNITED STATES v. BERNAL.

[1 Hoff. Land Cas. 50.] [1]

District Court. N. D. California. June Term, 1855.

MEXICAN LAND GRANT—VALIDITY OF GRANT.

The allegations of fraud not being proved by the United States, the claim must be confirmed.

Claim for one square league of land in San Francisco county, confirmed by the board, and appealed by the United States.

S. W. Inge, U. S. Atty.

Halleck, Peachy & Billings, for appellees.

HOFFMAN, District Judge. The confirmation of this claim was resisted on the part of the United States on the ground of fraud. The court being desirous that the fullest opportunity should be afforded to the appellants and the numerous parties interested in defeating this claim to establish the charge, has devoted an entire week to its investigation. A mass of testimony has accordingly been taken, but it is for the most part so inconclusive, irrelevant and conflicting that the district attorney in his concluding argument forbore to allude to it, and based his objections to the confirmation of the claim almost exclusively upon the suspicions suggested by a comparison of the original title papers with the expediente from the archives. A brief review of the testimony may not, however, be inappropriate.

The claim of the appellees is for a tract of land, or more correctly, perhaps, for two tracts, known as the "Rincon de las Salinas" and the "Potrero Viejo," as shown by the map accompanying the expediente. In support of

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

this claim, the appellees have offered in evidence the original documento or title paper issued by the governor to the party interested; a map certified to be a copy of that which accompanies the expediente, and a certificate of the approval of the grant by the departmental assembly. The expediente was also produced by the United States, and is chiefly relied on by the district attorney as affording evidence of fraud on the part of the claimants. On examining the expediente and comparing it with the title papers produced by the claimants, it is obvious that the words "y Potrero viejo" have been interlined in two places, and in one instance in a handwriting evidently different from that in which the body of the document is written. The map, too, found in the expediente differs from that produced by the party, for the words "que pide" are not found in the former. The effect of these discrepancies will be subsequently considered. It is sufficient at present to observe that the only inference which can by possibility be drawn from them is, that although the grant for the Salinas was regularly obtained, that for the Potrero viejo has been subsequently interpolated, and the map in the possession of the claimants made to conform to the interpolated grant.

The principal witnesses produced on the part of the United States to establish the alleged fraud on the part of Doña Carmen Bernal were Mrs. Lowell and her husband, Marcus Lowell, and a Mexican woman named Teresa Moreno. Amidst the contradictions, inconsistencies and misstatements, to call them by no harsher name, of these witnesses, it is almost impossible to obtain any definite idea of the precise character of the fraud sought to be established. The district attorney, as has been stated, did not in his argument rely on their evidence as establishing any one fact in the case; nor did the counsel retained by those who have an interest in defeating this claim attempt to reconcile the contradictions in their testimony, or to deduce from it any clear or consistent theory of the case to be adopted by the court. The principal facts sought to be established by the testimony of these witnesses were as follows: That Doña Carmen Bernal had shown them her title papers; that the papers now produced are the same, but have since been altered; that, as testified by Mr. and Mrs. Lowell, the alterations were effected by a Mexican who came with a party from Monterey for the purpose; or, as testified by Teresa Moreno, that the papers were altered by a person named Barragan, residing in the house. On examining their testimony, it strikes us as surprising that Doña Carmen should have so freely exhibited her title papers to the witnesses, and have asked their opinion as to their validity, although one of them, and the only one who seems to have expressed an opinion, was an American who had never seen a Mexican grant, and who was unable to read or comprehend a word of Spanish; and it appears, at least, extremely improbable that she should so freely have avowed her intention to have the fraudulent alterations made pursuant to the suggestions which Mr. Lowell himself tells us he did not scruple to make.

In testifying to the alterations made in the papers, the witnesses professedly rely on their recollection of their contents when exhibited to them in 1851. They took no copy of them, nor did they make any comparison then of the papers shown them with any others. They merely swear, with more or less confidence, that certain portions of the papers have since been added. Mrs. Lowell, who was the first witness examined, testified that she recognized the title papers as those shown her by Doña Carmen; that the words "el terreno de la Mision que pide" were not on the map when she saw it, nor the words "Laguna," "terreno que pide" and "aguagita;" that there was no seal on the eighth page, and that the date on that page has been altered; that she had no recollection of the seal on the ninth page, and that there is more writing on it now than when she saw it; that she translated it to her husband; and that what she translated to her husband contained no grant for the Potrero. With regard to the eighth page, Mrs. Lowell at first testified that she saw no alteration or addition to it, except the certificate of J. L. Herg and the seal, which were not on that page when she saw it in the possession of Doña Carmen. That she was sure there were no other alterations. She immediately afterwards stated that she was not quite sure she had ever seen the eighth page before; that her reason for supposing it to be the same paper she saw before is, that it was "the same looking paper," and that the writing looked something like what she had seen; and she adds that she cannot say on oath that she had ever seen it before. In a subsequent part of her examination, she states that she remembers having seen the eighth page; that the word "Salinas" on that page has since been "put in," and that she is certain she saw that page before "by the reading on it." Marcus Lowell, her husband, when called to the stand, testified with a confidence and an apparent candor well calculated to give plausibility to his evidence. In some particulars his testimony conflicts with that of his wife, while on some points, and those the most important, it is completely disproved. This witness swears in the most positive manner that the only papers he ever saw were the fifth, sixth, seventh and eighth pages of the originals submitted; that he never saw the ninth page which his wife stated she translated to him; and that the eighth, on which his wife detected only a few alterations, was a perfect blank. This last statement he frequently reiterates with a positiveness which would have been impressive, if the other testimony in the case had permitted us to hesitate a moment in believing him to have been

mistaken. He also states that there was no writing whatever in the place on the map where the words "el terreno de la Mision" now are; nor were the points of the compass marked on it then as now.

On both these points the opposing testimony is conclusive. On the eighth page, which, according to Mr. Lowell, was a blank, and according to his wife there was writing, but no certificate of the county recorder, appears the certificate of that officer duly signed and dated February 19, 1850, more than a year previous to the time when the witnesses say they saw it. It is idle to allude to the absurdity of the supposition that such an endorsement would have been forged, as useless crimes are not ordinarily committed; for not only is the genuineness of the signature of the recorder fully proved, but the original records from his office are produced, and the document appears fully recorded and containing everything which Mrs. Lowell supposes has been since added. The record further shows, that at the time it was made, all the documents existed and were presented for record precisely in the state they are now offered to the court, with the exception of the map, which was not recorded; and it conclusively disproves, not only Mr. Lowell's statement, but it removes whatever doubts might have been suggested by the testimony of his wife as to additions and alterations which she swears have since been made. But independently of this and other evidence, which will hereafter be adverted to, the testimony of Mr. and Mrs. Lowell on the points under consideration is entitled to but little weight. Their whole evidence is exclusively founded on their recollection of documents seen more than four years ago. The husband was then, and is now, totally ignorant of the Spanish language, and wholly unacquainted with the forms used in Mexican grants; and the wife when called on to translate in open court one of the papers, after slow and painful attempts. only succeeded in rendering into English detached words and "disjecta membra" of sentences not sufficient to convey to herself, or any one else, a clear idea of the purport of the document. It is incredible that the recollections of such witnesses as to the contents of papers could be sufficiently accurate to justify the court in relying with confidence on their testimony.

With a view of showing by whom the alterations in the papers were made, much testimony was taken as to the visit to Doña Carmen of a party from Monterey. On this as on the other points the witnesses contradict each other. Mrs. Lowell swears that the party consisted of four—three Americans, dressed in American costumes, and one Mexican, a stout man of a dark complexion; she had, however, previously stated that she did not know of what country three of them were, but one was a Mexican. She further says that they went together into a large front room, but that she did not go into it while

they were there. Her husband states, with considerable minuteness, the appearance of the party: that three were Indians, and servants to the fourth, who was a Mexican mounted on a black horse; that he went into the house while his servants remained in the kitchen; and that he wore a broadcloth mantle trimmed with silver. To any one acquainted with the difference in appearance between Americans and the Indians of the country, the existence of such a discrepancy suggests doubts which impair the credibility of all the evidence of these witnesses. But Mr. Lowell does not confine himself to the mere statement, derived, as he says, from Doña Carmen, that the Monterey party had "fixed" the papers. He testifies that while the Mexican gentleman was at breakfast, having occasion to enter the room of Doña Carmen, he there saw on the table some Spanish papers, and near them a kind of seal. corresponding in size with the impression on page eight of the original document; that he examined it for about half a minute, and that he is sure it would make just such an impression as that on the paper. On his cross examination he asserts with characteristic confidence that the word on the seal was Monterey (written Monterea, or Monte de rea). There was also a word before Monterea. "He is very certain of it; he cannot be mistaken." It will be remembered that he and his wife had previously sworn that when they saw page eight, there was no seal upon it. The object of Mr. Lowell's testimony is therefore apparent.

Unfortunately, however, for Mr. Lowell's statement, it is shown conclusively by the testimony of Francisco Arce, who was a clerk in the office of the secretary of the former government, and sometimes secretary ad interim, and by that of Governor Alvarado, who has held almost every office of dignity in California under the Mexican rule, that the impression on the eighth page is that of the private seal of the secretary of dispatch; that they have frequently seen it used, and examined it, and that it has no letters whatever upon it. A close inspection of the impression on the paper confirms this statement, and its accuracy is conclusively established by the exhibition of a similar but less blotted impression of the same seal on another document from the archives, which shows beyond a doubt that the device on the stamp had no letters upon it. The account given by the Mexican woman Teresa Moreno, of the person by whom the alterations were made, is different; she says that in January, 1852, she saw a Mexican who had been living in Doña Carmen's house for a year, more or less, altering them. Though she at first was unable to say who he was, she subsequently identified a person then in court, as the individual. At his own request, this person, whose name was Barragan, was placed on the stand, where he, in the most solemn and emphatic manner, denied having altered or even seen the

papers. He further stated that at the time mentioned, he was not living in Doña Carmen's house, and in this last statement he is corroborated by the testimony of another witness, Ramon De Zaldo, who knew him at the mission until after the time when, according to Teresa, the alterations were made. But from Teresa Moreno we learn who was the Mexican mentioned by Lowell and his wife as having made the alterations. She states that it was a Mr. Hartnell, a relative of Doña Carmen. Unfortunately, this gentleman is now dead, but witnesses of the greatest respectability testified to his character. He seems to have enjoyed to an extraordinary degree a reputation for integrity. He was an Englishman by birth, but long resident in this country, where he had acquired a considerable property, and the witnesses called to testify as to his character, seem at pains to express, in the strongest manner, their sense of his high reputation for probity and inflexible honesty. He is shown moreover, to have been a short stout man, of a florid or light complexion, such as is usual in Englishmen, and to have worn the ordinary dress of his countrymen or of Americans. While listening to the description of his appearance given by the witnesses, it was certainly not easy for the court to recognize in him the Mexican of dark complexion, mounted on a black horse, and clad in a broadcloth mantilla, laced with silver, described by Mr. Lowell.

One other point on which the testimony of Mrs. Lowell and her husband may be deemed material, remains to be noticed, viz. the admissions of Mrs. Bernal to them. Mrs. Lowell in her direct examination, swears that she told Mrs. Bernal she had better have the papers fixed; that there was one paper that had a seal to it which was right, but the other, which had no seal, was not right. Mrs. Bernal then said she would have them fixed; "that she had no doubt as to the Potrero, but had some doubts as to the place where she was living, the latter being called 'Doña Carmen's Rancho.'" She further states that after the visit of the party from Monterey, Mrs. Bernal told her the papers had been fixed good and sure, and that she now had the title for the place she was living on; that she had heard Mrs. Bernal speak to her (the witness') husband about the date of the papers, and say to him that she should have the date made later than it was; that he advised her to get the papers right for the place on which she then was living, as they were not right as they were, and that Mrs. Bernal replied she would get her lawyer to fix them. The change recommended, was to get the title papers so fixed as to embrace the Potrero, and the Rincon de las Salinas. Mr. Lowell testifies that Mrs. Bernal stated to him that she had no fear as to the Potrero, because she had lived on it, and done all that was required of her, but that she was doubtful as to the other part, and therefore went and lived on it. That he thereupon gave her some advice, which he declines to state, on the ground that it would criminate himself, to which Doña Carmen replied that there were parties who she understood could correct the papers. After the visit of the party from Monterey, the witness adds, Doña Carmen seemed to be in good spirits. The above embraces all the admissions of Mrs. Bernal which might seem to possess any importance. If they prove anything, they prove that Mrs. Bernal's title to the Potrero viejo was, in her own opinion, perfectly good, and that the necessity for the papers being fixed, either by her lawyer, Mr. Halleck, or by her friends from Monterey, only existed with regard to the Rincon de las Salinas, and that they were so fixed by the party from Monterey, which figures so largely in their evidence.

Whatever doubts might arise in any case as to the reliability of evidence of conversations and admissions, they present themselves in this case with unusual force. Not only do Mr. and Mrs. Lowell contradict each other on many points, but the unfortunate attempt of the former to strengthen his evidence by an account of his discovery of a seal in the bed chamber of Mrs. Bernal abundantly justifies us in receiving with distrust and suspicion every statement which he makes. That Mrs. Bernal should have announced the fact that she had procured a forgery to be committed, is incredible; and to suppose that she so freely declared her intentions to procure for that purpose the services of a gentleman so well known, and of such high character as Mr. Halleck, is absurd. If any explanation of these statements by Mrs. Bernal is needed, it is found in the testimony of Teresa Moreno. That witness states that after Mr. Hartnell left, Mrs. Bernal said she had determined to take his advice, which was to consult Mr. Halleck as to the expediency of selling, renting or otherwise disposing of the property. It was probably some such remark as this, perhaps misunderstood, certainly misrepresented, which has suggested to the fertile imaginations of the witnesses the story of the Monterey party, with all its dramatic details. But independently of the intrinsic incredibility of the testimony of these witnesses, there are some clearly established facts in the case which conclusively disprove it.

The record produced from the recorder's office, shows beyond a doubt that the original papers, as they now exist, were recorded there more than a year before the time when Mr. and Mrs. Lowell first saw them. The ingenuity of counsel has suggested no answer to this decisive fact, nor can any be given, unless we suppose that a wholesale falsification of those records has been committed by another party from Monterey, who in some unexplained way have obtained access to them, and who have since consummated their crime by forging the name of J. L. Herg, the recorder, appended to the

endorsement on the originals. With a view of strengthening their case, the original expediente from the archives ·was introduced by the counsel of the parties interested in defeating this claim. By a comparison of that document with the original title papers in the possession of the party, the origin of the charge of fraud in this case becomes obvious.

The petition asks for a grant of the Rincon de las Salinas alone, and not for the Potrero viejo. (This petition, it may be observed in passing, which was never included among the title papers delivered to the party, Teresa Moreno swears was shown her by Mrs. Bernal, and that it asked for the Potrero viejo.) The concession which follows the petition, declares Don Cornelio Bernal owner in full property of the place named Las Salinas, with the Potrero viejo. In this document, which was the original concession by the governor, the handwriting is similar throughout, and there is nothing to suggest any interpolation. But in the record of the proceedings of the departmental assembly; the words "y Potrero viejo" have evidently been interlined at a time and with ink different from that used in the body of the document. In the copy of the document or title paper delivered to the party, which forms part of the expediente, the words "con el Potrero viejo" have in like manner been interlined, but whether in the same handwriting as that in which the rest of the record is written, it is not easy on inspection to discover. Whether or not there is reason to believe, under the circumstances of the case, that the grant for the Potrero viejo has been fraudulently added to the original grant, will presently be considered. One fact is apparent, that the doubt exists as to the Potrero, and not as to the Salinas, and that the efforts of the witness, Mrs. Lowell, to cast a doubt on the title to the Salinas, by suggesting that those words have been added on the eighth page, however well meant, were certainly misdirected. The same witness testifies, as has been before stated, that Mrs. Bernal said she had no doubt as to the Potrero, but had some doubts as to the place she was living on, and that after the departure of the party from Monterey, the papers had been "fixed good and sure," and that she now had a title for the place she was living on. It is apparent that the inference sought to be drawn from the interlineations of the words "Potrero viejo" in the expediente, is wholly inconsistent with the theory of the case, which supposes the fraud to have been committed with regard to the Salinas; and the suspicion is suggested that the witnesses, though intending perhaps to confirm by their testimony whatever doubts might arise from the appearance of the expediente, have unfortunately mistaken the object of their attack, and have directed the fraudulent efforts of the Monterey party upon the Salinas, when the true theory of the case demanded that they should have related to the Potrero exclusively.

Discarding, then, without further comment the testimony we have been considering, we approach the examination of the point on which the district attorney exclusively relied in his argument. It has already been stated that the words "Potrero viejo" have been interlined in the expediente in two places—in the copy of the documento or title paper, and in the record of the proceedings of the departmental assembly. This circumstance, together with the facts that the original petition does not ask for the Potrero, and that the map accompanying it does not contain the words "que pide" after the words "terreno de la Mision," are relied on by the district attorney as tending to show a fraudulent alteration of the title papers. If the documents from the archives were the true and only title deeds of the claimants, this objection might well be deemed insuperable.

It will be remembered that by the regulations of 1828, it is made the duty of the governor, after taking the necessary information as to the propriety of granting the land solicited, to accede or not to the petition. When he determined to grant the prayer of the petitioner, a decree or concession was made by him declaring the appellant to be the owner in full property of the land solicited. This decree is invariably found in the expediente, and it usually commences with the words "Vista la peticion." When the approval of the assembly was obtained, a certificate of the fact was given to the interested party; but an expediente containing the report of the committee and the resolution of approval, signed by the president of the assembly, seems to have been transmitted to the governor, and retained in the archives. The concession of the governor having been definitively made, it was his duty, under the seventh article of the regulations, to issue to the party interested a "documento" or grant, which might serve as a title paper. A copy of this documento or title paper issued to the party was made, and in some instances recorded in a book kept for that purpose. This copy, found in the expediente, is usually, as in the case before us, not signed, and, as appears by the testimony of Mr. Evershed, often contains erasures and interlineations. The instrument, then, by which the title passed to the party was the "documento," delivered to him after the concession was made, and to this and to the concession which preceded it, we must look to ascertain the nature of the grant.

On referring to the expediente, we find the concession duly signed by the governor and the secretary (the latter of whom established the genuineness of his signature by his own oath in court). The land granted is mentioned as "the Salinas and the Potrero

viejo." No suggestion has been made that these words are not in the same handwriting, nor that any interpolation has been made in this instrument. The documento or title paper produced by the party, is in exact conformity with the concession, without interlineations or interpolations. The genuineness of this document is fully proved by Don Francisco Arce, who testifies not only to his own signature and that of the governor, but he also declares the whole document to be in his own handwriting. We think that from the testimony of Governor Alvarado and of Don Francisco Arce, it is clear that these papers are genuine, and there is nothing either in the evidence or in their appearance to justify a suspicion that they have in any way been altered, for we consider the circumstance that the unsigned draft or copy of the documento has been interlined as of no weight where the original is produced, and its authenticity fully established.

The effect of the interlineation in the resolutions of the departmental assembly remains to be considered. In that paper the words "y Potrero viejo," spelled "vejo," have evidently been interlined. With respect to this interlineation, Francisco Arce testifies that he thinks it in the handwriting of a person named Gonzales, who was employed in the secretary's office. The certificate of the approval of the assembly delivered to the party is without interlineation or alteration of any kind, and it refers to the Potrero viejo as well as the Salinas. The signatures of Alvarado and Jimeno to this document is conclusively proved, the former by Governor Alvarado himself. The handwriting of the body of the instrument is also proved to be that of one Estrada, a clerk in the secretary's office. But we are fortified in the conclusion with respect to the authenticity of this certificate to which we are irresistably led by the evidence, by some considerations suggested by the papers themselves.

By the terms of the resolution of the assembly, as found in the archives, that body approves the concession made by the governor, ad interim, Don Manuel Jimeno, of the tract of land called Las Salinas "y Potrero vejo," the last words being interlined. Now, the concession of Governor Jimeno is, as we have seen, for the Salinas and also the Potrero viejo. If, therefore, the assembly meant to approve the concession, as they evidently did, they must have intended to approve the grant for both pieces of land. The omission of the Potrero viejo was in all probability a clerical error, which was corrected when the terms of the concession were compared with those of the resolution of approval. On the back of this page of the expediente appears a memorandum, stating that on the 30th day of May a testimonio or certificate of the foregoing approbation was delivered to the party.

On referring to this testimonio produced by the claimants, we find it dated the 30th of May, 1840, in conformity with the memorandum, and it is signed by Alvarado, as governor, and Manuel Jimeno, secretary. Unless, then, the signature of Jimeno is forged, an idea not suggested by any one in the case, and wholly inadmissible, we must suppose that the assembly confirmed the concession for the Potrero viejo, as well as that for the Salinas, according to the tenor of the certificate, for the resolution of approval is signed by the same Jimeno as president, and is for the confirmation of a grant made by himself. If, therefore, the assembly had only approved, as contended, the Salinas concession, while that for the Potrero has since been fraudulently inserted, Jimeno, the president of the assembly, who authenticates the record by his signature, must surely have known it; and yet, within eight days after the passage of the resolution, he signs a testimonio for the approval of the concession of both tracts to be delivered to the party. But we think that the burden of accounting for the interlineation in the report of the committee cannot justly be thrown upon the claimants. They produce the certificate of the approval, duly authenticated. The genuineness of this document is not disputed, or if disputed, it is conclusively proved. That the report of the committee, with the resolution of approval attached, which is preserved in the archives, should contain interlineations is a circumstance which might very naturally happen, and yet the claimants may have no means to explain it. If the certificate of the approval given to the party interested be genuine, it must be received as the legal and conclusive evidence of the fact, unless other circumstances show that it was improperly furnished through fraud or mistake.

An attempt on the part of the opponents of this claim to show by whom the interlineations in the expediente were made should perhaps be noticed. Mr. James Thompson, a witness produced on the part of the United States, on being shown the expediente, testified that he had seen it several times in the office of the surveyor general; that he recognized one page certainly from the interlineations upon it; that he believed he had seen the same paper in the hands of Mr. De Zaldo, at the mission. He was then asked what Mr. De Zaldo had told him with respect to the paper. To this inquiry, the counsel for the respondents objected, and the objection was sustained by the court. William Corbett also testified that he had frequently met Mr. De Zaldo on the road between this city and the mission with a bundle. He was then asked what was the subject of the conversation, and what he said he had in the bundle. To this question the counsel for the respondent objected, and the objection was sustained by the court. With a view, however, of enabling the parties to prove, if possible, that Mr. De Zaldo had some knowledge of or connection with

the alterations in the expediente, that gentleman was placed upon the stand by the court. He denied, in the most emphatic manner, and with an indignation not unnatural, that he had ever had the expediente in his possession, except in the office and as keeper of the archives, and stated that it had never, to his knowledge, been out of the archives. He also denied in the most positive manner ever having stated to Mr. Thompson that he had many Mexican archives in his possession; and with reference to Mr. Corbett's testimony, he explained that he had been employed in translating many expedientes for a legal firm in this city, but that those translations were made from fac simile copies on tracing paper, made in the surveyor general's office, and that the originals were in no case taken from the archives. No questions were put to the witness as to any conversations with Mr. Thompson relative to alterations in the documents, and the attempt to prove that he had made such declarations, if ever seriously made, seemed to be abandoned.

Much time was consumed on the trial of the cause in hearing testimony of experts and others as to alterations in or additions to the map produced by the claimants. We do not deem it necessary to refer particularly to the evidence on this point. The testimony of Mr. and Mrs. Lowell with regard to other alterations has been so conclusively refuted, that we think no reliance whatever can be placed on their recollection as to what words were or were not on the map when it was exhibited to them. The testimony of the experts called to prove by inspection that the words on the map were, in their opinion, written by a different hand, or at different times, or with different ink, or with a different pen, must, we think, be regarded rather as plausible conjectures than as affording any solid basis for an absolute conclusion. On comparing, however, the map in the expediente with that produced by the party, we find that the words "que pide" do not appear in the former. But it is to be considered that the grant is for "Las Salinas and the Potrero viejo," as shown by the map which accompanies the expediente. To this latter alone, then, we look to ascertain the situation and boundaries of the granted land, and on this it is not suggested that any alteration or addition has been made.

How the certified copy of the map in the possession of the party came to differ from that in the expediente, does not appear, but Francisco Arce testifies that all the writing on it is in the hand of Pedro Estrada, the words "que pide," as well as the rest. That those words have been fraudulently inserted, is, we think, an idea that cannot be entertained, for so long as the map in the expediente, according to which the land was granted and to which the grant refers, remained unaltered, any addition to the certified copy was wholly useless. The fact that the expediente map remains unaltered, has even a double significance, for it serves to repel the suspicion that the expediente has been tampered with. Whoever was engaged in introducing fraudulent interlineations into that instrument, would hardly have omitted to make such additions to the map as were necessary to carry out his object.

We have thus, with some care and at perhaps unnecessary length, reviewed the testimony in this case. We find no reason to conclude, perhaps none even to suspect, that any fraud has been attempted. To suppose it to have been committed, a series of forgeries and perjuries must have been committed of an extent and character without parallel. In the first place, the documento or title paper in the possession of the party, together with the certificate of the approval of the departmental assembly, with all their signatures, must have been forged. The original concession in the expediente must also have been forged, and the skillful hand which could thus have imitated Jimeno's writing, must be supposed to have made the interlineations in the resolutions of the assembly and the copy of the grant, without an attempt to make these interlineations resemble the writing of the body of the instruments. The map, perhaps from some sudden qualm of conscience, he must have wholly neglected, although the mere addition of the words "que pide" would have accomplished his object. In addition to this, if Mr. and Mrs. Lowell are to be believed, the useless crime of forging the name of the county recorder in this city must have been committed, and some means have been discovered to procure the recording at length, in the books of the recorder, of all the original papers precisely as they are now exhibited—the record purporting to have been made more than a year before the time when, according to Mr. and Mrs. Lowell, the originals, which have since been altered, were exhibited to them. A supposition involving such a series of impossible or improbable crimes, we are surely justified, under the evidence in this cause, in rejecting.

No other objections to the confirmation of this claim than those we have been considering, have been urged before this court. It is not denied that the grantee fulfilled the conditions of his grant. He appears to have resided on his land from the date of his grant until his decease, and his widow and heirs still continue to occupy it. The only objections raised by the law agent before the board were, that the land was within the ten littoral leagues, and that no juridical possession of it was given. Both of these objections this court has already considered and overruled. The claim of the respondents must therefore be affirmed.